[Civ. No. 40682. Second Dist., Div. Five. Apr. 9, 1974.]

MINSON COMPANY, Plaintiff and Respondent, v.
AVIATION FINANCE, Defendant and Appellant.

## COUNSEL

Cavalletto, Webster, Mullen & McCaughey and Hugh J. Haferkamp for Defendant and Appellant.

James W. O'Brien for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.** — Defendant Aviation Finance appeals from a judgment quieting title in plaintiff Minson Co. to a parcel of real property located between a road running through defendant's property and the section line which (according to the deed) forms the southern boundary of defendant's property. The action was brought to determine the common boundary line between plaintiff's northern boundary and defendant's southern boundary.

The facts are as follows: In 1958, both parties acquired title to the parcels of land which are central to the issues herein raised. Defendant acquired title to a parcel of land described as "the south half of Section 7, Township 9 North, Range 33 West . . . in the County of Santa Barbara." Plaintiff's parcel was located in the northwest quarter of the northwest quarter of Section 18, Township 9 North, Range 33 West in the County of Santa Barbara and consisted of the west half of that quarter quarter-section. Defendant's parcel lies immediately adjacent to and north of plaintiff's parcel.

The crux of the litigation centers around road-building activity which took place in the late 1890's or within a few years thereafter. Sometime

during this period, a county road approximately 50′ wide with an oil surface (now known as "Clark Road") was laid out in an east-west direction, running generally along the section line in the area of the parties' properties. The rough sketch of a portion of plaintiff's exhibit shown below will help to explain the topography of the area at issue:

The primary problem involved in this case arose because of the fact that there was a jog built into this road. From a westerly to easterly direction, the road was built on the section lines between Sections 12 and 13, Township 9 North, Range 33 West which are immediately adjacent to and west of Sections 7 and 18, respectively. At the point of the range line between Ranges 33 West and 34 West, the road turns sharply north for approximately 133 feet (to the centerline). At that point, the road again turns sharply to the east and continues in an easterly direction. The centerline of the road rejoins the true section line at a point approximately two miles east of the range line forming the western boundary of Sections 7 and 18.

The effect of the road's jog to the north and then southeasterly rejoining of the section line as the centerline of the road east of that jog has been to create an isolated, generally triangular parcel of land which lies in

Section 7, but between the road and the true section line of Sections 7 and 18. The land in dispute consists of approximately 1.73 acres.

The origin of Clark Road dates back to at least 1883. In that year certain Road Viewers proceedings were held in response to a petition brought by landowners to have a road constructed to service the area. For reasons that were not resolved by the parties at trial, the road that was established did not follow the true section line between Sections 7 and 18, but made the jog previously described.[1] In any event, the road was built with the jog.

The evidence established that the lands adjacent to the disputed area had been devoted basically to raising grain. With respect to the parcel in dispute, that land area was not so farmed because of flooding, which occurred during the planting season.[2] At some time in the past, the Eames family, who had lived on the property presently occupied by plaintiff, erected a three-strand barb-wire fence just south of the road. Defendant's predecessor in title had similarly erected a three- or four-strand wire fence on the north side of the road. Mr. Eames testified to the existence of a house on the disputed parcel of land. However, the house was unoccupied[3] and was removed from the land around 1914.

After plaintiff acquired its property in 1958, it erected a mobile home park on land which was well south of the true section line between Sections 7 and 18. Between approximately 1960-1966, it also leased land to a couple for the operation of a nursery. The nursery was not located on the disputed property, but the property was used for ingress and egress to and

---

[1]At trial, there were conflicting versions relative to the construction of the road with the jog. According to plaintiff, the jog occurred because the parties' predecessors in title deemed that the section line between Sections 7 and 18 formed a common corner on the range line between Range 33 West and 34 West about 171' north of the common corner where the section line between Sections 12 and 13 intersect the above range line. Since the petition signed by the landowners in the area envisioned a road following the section lines, the road was a natural outgrowth of that desire. Defendant, while not disagreeing that the deed granting the right-of-way to construct the road contained calls that were erroneous, argues that the jog in the road was designed to skirt a flooding condition which occurred during the winter. If the road had followed the *true* section line between Sections 7 and 18, it would have run through the area subject to flooding.

[2]Apparently, the flooding occurred intermittently, as there was testimony that the land was farmed when the lake created by the flooding dissipated. When this occurred is not certain, but it did occur some time after the road was built.

[3]The house was not occupied by any of plaintiff's predecessors in title as far as can be ascertained from the record. A Mr. Norris testified that as a child he had played in the house which was described as being at that time (circa 1906) an "old" house.

from the nursery by car. On the disputed land, plaintiff erected a large sign at a cost of $3,000, advertising the park. Apparently it was the erection of the sign which brought about the instigation of the litigation now before this court.

The judgment of the trial court established the centerline of the road as the boundary between the lands owned by the parties. Defendant contends on appeal that the judgment is not supported by evidence that there was an initial uncertainty as to the true boundary between the parcels of land. Specifically, defendant challenges the court's finding that the property owners of the respective parcels "acquiesced in treating the centerline of the road as the boundary after it was established as the true boundary line. . . ."

■ Since the judgment was on the merits, the burden of persuading an appellate court that the judgment is not supported by the evidence is upon the appellant. (*Still* v. *Plaza Marina Commercial Corp.*, 21 Cal.App. 3d 378, 384 [98 Cal.Rptr. 414]; 6 Witkin, Cal. Proc. (2d ed. 1971), Appeal, §§ 245, 248, pp. 4236-4238, 4240.) ■ We are of the opinion that the burden here has not been met, and the finding of fact challenged is supported by substantial evidence.

■ It is well settled that the doctrine of agreed boundaries is intended to secure repose and prevent litigation. (*Cavanaugh* v. *Jackson*, 91 Cal. 580 [27 P. 931]; *Kraus* v. *Griswold*, 232 Cal.App.2d 698 [43 Cal.Rptr. 139].) ■ As stated in *Loustalot* v. *McKeel*, 157 Cal. 634, 642-643 [108 P. 707]: "Courts have always looked with favor on the settlement of questions of this character by the parties in interest themselves, and when it appears that an agreement adjusting a disputed boundary line has been fairly and definitely made between them and they have occupied their lands accordingly for a period longer than the statutory period of limitation, such agreement is conclusive no matter whether they were mistaken or not in their belief that they were locating it along the true line. It is quite obvious that if the fact merely that the parties were mistaken as to where the true line lay could invalidate their agreement, there never could be any stability attached to such an agreement unless the line agreed on was in truth the exact line. The policy of the law, however, is to give stability to such an agreement as a method adopted in good faith by the parties themselves to settle the controversy, and because it is the most satisfactory way whereby a true boundary line may be determined, and tends to prevent litigation. [Citation.]"

■ In order to establish an agreed boundary by parol, it must be shown

that (1) there is uncertainty as to the true boundary; (2) an agreement between coterminous owners as to the true boundary; (3) acquiescence to the line so fixed for a period equal to the statute of limitations; and (4) the boundary so fixed must be identifiable on the ground. (See *Ernie* v. *Trinity Lutheran Church,* 51 Cal.2d 702 [336 P.2d 525]; *Roman* v. *Ries,* 259 Cal.App.2d 65, 68 [66 Cal.Rptr. 120]; *Aborigine Lumber Co.* v. *Hyman,* 245 Cal.App.2d 938, 941 [54 Cal.Rptr. 371].)

 In the instant case, the question of whether or not the doctrine of agreed boundary governs rests upon the determination of whether there was uncertainty as to the true location of the boundary line. The record shows that on April 4, 1883, the coterminous property owners, who included the parties' predecessors in title, filed a petition which asked that the County of Santa Barbara construct a road along the section lines in the area which included Sections 7 and 8. Less than two months later, on the basis of a survey conducted by one Reed, a deed was executed by the parties' predecessors in title which contained a description establishing an offset of approximately 171 feet which purportedly represented the distance between the common corner of Sections 7 and 18 on the north, and Sections 12 and 13 on the south, along the range line. It was along the general confines of this description that the road in question was built. Clearly, this deed was evidence that the parties deemed to treat the description set forth in that survey and the road which would be its physical manifestation as an accurate representation of the location of the section line which formed the boundary between their parcels of property. As such, the trial court was entitled to conclude that the agreement to treat the road as the boundary was based upon, or ensued from, uncertainty as to the true location of the section line between Sections 7 and 18. In other words, since the petition established that the road was to follow the section line (which is but an invisible line on the face of the land), the signing of the deed which contained the description along which the road was to follow evidenced the parties' intent to treat the location of the road as the true section line.

The application of the doctrine of agreed boundary is not precluded by the fact that although it was the intent of the parties to set the boundary along the true section line, their failure to do so was merely the result of mistake. (*Martin* v. *Lopes,* 28 Cal.2d 618, 625 [170 P.2d 881].) Similarly, the doctrine is applicable where it is shown that both parties lack the knowledge of where the line actually was. (*Id.* at p. 626.) Nor is it material that the true boundary line could have been ascertained by a proper survey. (*Id.*)

Here, the record shows that the parties' predecessors in title implicitly agreed to treat the road as the physical representation of the section line separating their parcels. This decision was acquiesced in for over 60 years by the parties, during which time plaintiff erected fences on the disputed property and otherwise treated it as his own. We cannot say that under these circumstances the trial court incorrectly declined to disturb the boundaries established by the parties. (*Vella* v. *Ratto,* 17 Cal.App.3d 737, 740-742 [95 Cal.Rptr. 72].)

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.